UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

**CARRIER CREDIT SERVICES, INC.,**
As agent for SEA STAR LINE, LLC,

    Plaintiff,

vs.                                             Case No. 3:03-cv-954-J-25HTS

**TROPICAL DISTRIBUTORS CENTER, INC.,**

    Defendant.
_____/

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

**THIS CAUSE** came on for trial before the Court on March 22, 2005. After having heard the testimony at trial, reviewed the exhibits in evidence, and stipulations by the parties, the Court makes the following findings of fact and conclusions of law:

### Background

Carrier Credit Services, Inc. (Carrier), as agent for Sea Star Line, LLC (Sea Star), filed an Admiralty Complaint against Tropical Distributors Center, Inc. (Tropical).[1] Carrier is the agent for

---

[1] To streamline this Order, the Court will refer to Carrier as Plaintiff rather than Plaintiff/Counterdefendant and Tropical as Defendant rather than Defendant/Counterclaimant. Tropical has filed a third party complaint against Carribe Transport. However, Carribe has not made an appearance in this case.

    Plaintiff has filed proposed findings of fact and conclusions of law. Defendant has a filed a memorandum of law but no proposed findings of fact and conclusions of law. These omissions have made the Court's job more time consuming than it need be. Further, some of Defendant's exhibits which were produced at trial are labeled with a different case caption and number.

Sea Star, a shipping company hired by Tropical.

The Complaint in this case alleges that Tropical owes Carrier $97,790.00 in unpaid demurrage charges plus an administrative collection fee of 35% which equals $35,226.50 for a total amount claimed of $133,016.50.[2] Carrier bases this action on invoices dated between July of 2002 and October of 2003.

Tropical has filed a Counterclaim, contending that Sea Star wrongfully terminated the shipping agreement between the parties. Tropical maintains that this termination forced it to incur increased shipping costs, thereby decreasing its profit; it was forced to utilize a more expensive shipping service when Sea Star terminated their agreement.

## **FINDINGS OF FACT**

1. Tropical used Sea Star's shipping containers to transport its goods after the goods arrived at their final destination port.

---

[2] The Complaint and other pleadings in this case state the total allegedly owed is $132,016.50. However, the Court calculates the total claimed as $133,016.50.

The Court also notes that a dispute arose at trial regarding a change in the free time calculations. (Page 10 of the trial transcript) (Unless otherwise noted, future cites to the trial transcript will simply identify the page number or the page number and line that contains the testimony at issue. Trial exhibits will be referred to as either Defendant's or Plaintiff's Exhibit followed by the relevant number). Tropical argued that it based its calculations on the free time policy provided to it by Carrier which evidently was changed during the relevant time period.

However, the invoices at issue and the statement of charges filed prior to trial demonstrate how much Sea Star/Carrier charged Tropical for demurrage. Thus, Tropical's calculations should also be based on how much it was actually charged and the change in policy should not be relevant to either Tropical's or the Court's calculations. Further, no party has provided an amended computation of damages to demonstrate that Tropical's totals re: disputed invoices are incorrect.

2. Sea Star gave Tropical a "free time" period that it could use the containers for no charge. If Tropical did not return the containers to Sea Star within this time period, it was assessed a demurrage charge.

3. The contact at issue, called a Transportation Services Agreement (TSA), allowed Sea Star to assess a demurrage charge.

4. On multiple occasions, Tropical retained Sea Star's containers past the freetime period. Carrier Credit, after receiving electronic information from Sea Star regarding the demurrage incurred by Tropical, generated and mailed Tropical invoices.

5. Tropical's president, Elliott Giraud, testified that he became aware that his company was incurring significant demurrage charges only when he received these bills from Carrier because he did not receive them until after the containers were returned.
(Page 63, line 12-19)

6. Tropical did not proffer any evidence that Sea Star's agreement with the trucking company, Carribe Transport, affected Tropical's obligation to pay Sea Star demurrage charges or that any Sea Star or Carrier employee told any person affiliated with Tropical that it was not responsible for the demurrage charges.

7. The applicable tariff required Tropical to pay an administrative collection fee on freight charges.

8. Tropical has not paid any of the demurrage charges.

9. Tropical filed suit against Sea Star in another Court regarding damage to some of Tropical's shipments. A settlement was reached in that case.

10. At some point, Sea Star decided to cease providing shipping services to Tropical.

Tropical did not proffer any evidence that Sea Star cancelled its contract to retaliate for the lawsuit brought by Tropical for damage to its cargo.

11. In an attempt to prove it was damaged when Sea Star terminated the shipping agreement, Tropical has introduced a statement of increased shipping costs.

## **CONCLUSIONS OF LAW**

The first issue is whether Carrier submitted sufficient evidence to support the demurrage charges at issue. At trial, Carrier first produced Brenda Britt, Sea Star's Director of Credit and Collections. Ms. Britt briefly explained the concept of demurrage charges as well as Sea Star's applicable tariff and bill of lading conditions. Ms. Britt did not testify regarding the authenticity of the charges at issue in this case.

Next, Mr. Rubino, Carrier's Collection and Accounting Manager, testified that Carrier charges demurrage based upon electronic data provided to it by Sea Star. Mr. Rubino testified that neither he nor any other Carrier employee have personal knowledge about the data that it receives from Sea Star. Thus, to "back up" the electronic data received, Plaintiff supports it with a Trailer Interchange Receipt (TIR) which ordinarily shows the discharge as well as return dates and times for the containers that Sea Star loans to companies such as Defendant. (Page 16, line 8-12, page 31, line 17-25, page 1-22; 44, line 9-25, page 45, line 1-7).

Tropical maintains that the invoices at issue are untrustworthy as well as unreliable and thus do not satisfy the business records exception to the hearsay rule. Carrier argues that the invoices at issue are admissible because they are corroborated by the bill of lading and the TIR. The Court agrees that a complete TIR provides sufficient evidence to substantiate Carrier's invoices even though no

4

person with actual knowledge testified at trial to corroborate the information contained in the invoices. A *complete* TIR provides sufficient details to allow a company to challenge an incorrect invoice calculation. Further, the TIR is ordinarily signed by a representative of both companies. The bills of lading and invoices, however, do not contain these safeguards. Carrier cannot use the invoices and bills of lading, without more, to establish the amount of demurrage fees. Thus, the Court cannot find that Tropical is responsible for the amounts listed on the invoices that are unsupported by complete TIRs. Each invoice must be supported by a TIR that contains complete and legible pickup and return information. Exhibits number 6, 13, 24, 26 and 30 do not have corresponding TIRs. The total amount of the invoices that lack a TIR is $24,340; this amount is not sufficiently substantiated and thus cannot be assessed against Tropical. Further, the TIRs that correspond to Exhibits 1, 2, 3, 4, 5, 11, 12 and 16 do not show a legible pick up time. These invoices amount to $18,002; these amounts also will not be assessed against Tropical. (Page 45, line 8-25, page 46, line 1-25, page 47, line 1-25, page 48, line 1-4). Accordingly, a total of $42,342 is subtracted from the relevant invoices.

Tropical also contends that it should not be liable for demurrage for any period of time that its cargo remained on Sea Star's property when Sea Star was at fault for a delay that caused the demurrage to accrue. *Marine Transportation Services Sea-Barge, Group, Inc. v. Python High Performance Marine Corp.*, 16 F. 3d 1133 (11th Cir. 1994) (holding that a marine transport company was not entitled to demurrage for periods while shipper's cargo remained on company's lots, where transport company was at fault for delays).

Mr. Giraud, Tropical's president, testified that Sea Star caused some delays that resulted in the demurrage charges at issue in this case. (Page 65, line 1-4 and line 7-8). However, Mr. Giraud

did not state that he had actual knowledge of *any* such delays to support his theory. The Court agrees that if Sea Star caused delays that hindered the trucking company from picking up the cargo at issue, Tropical should not be billed for the demurrage that accrued during those periods of time. Mr. Giraud's testimony, however, does not amount to evidence that Sea Star did in fact cause delays that hindered the trucking company at any time. Tropical also attempted to prove this point by generating "warehouse logs" for the Court's consideration. These purport to show when the containers at issue were returned. Tropical assert the logs demonstrate that after the containers were delivered by the trucking company to Tropical's warehouse in San Juan, the turn around time was usually three to four days. (Page 66, line 13; Defendant's Exhibit 6)[3] The warehouse logs contain Spanish terms, are not signed by any party and are not sufficient evidence to rebut the TIRs. No person with personal knowledge testified as to the accuracy or validity of these dates. Further, there is no attempt to match the log notations with the invoices at issue. Lastly, even if the logs were accurate, Tropical failed to submit any evidence that these dates determine the amount of demurrage at issue.

Tropical also argues that Plaintiff failed to mitigate its damages because it failed to timely advise Tropical that the relevant containers were unreturned; Tropical argues that Sea Star/Carrier knew that the containers were not in Tropical's custody or control but instead were in the possession of the trucking company. Tropical maintains that there were instances where it was not put on notice of the missing containers until months after the shipments arrived; Tropical found out about the charges only when it received the demurrage invoices. Tropical argues that this failure to timely

---

[3] The Court notes that the exhibit was filed with the Court March 16, 2005, three business days prior to trial.

inform it of the delays was "abusive in nature" because it allowed demurrage to accumulate on containers that were unreturned for up to three months. Tropical argues that if it had notice of the unreturned status of the containers it would have taken actions to retain the containers and returned them personally to Sea Star. Tropical also argues that Carrier had a clear financial motive for not giving it timely notice and for letting the demurrage accrue for extended periods of time; the rates for unreturned containers increase as time passes and thus the longer the container remains unreturned the more money it can charge Sea Star for its services. While Sea Star/Carrier's billing system may be unfair, Tropical produced no case law that Plaintiff was obligated to mitigate its damages regarding this issue. Nor did Tropical produce any evidence that it was uninformed regarding Plaintiff's billing practices. Thus, Tropical has failed to demonstrate it is entitled to a reduction based upon Sea Star's alleged failure to mitigate its damages.

**Collection Fees**

Ms. Britt testified that its bill of lading and tariff provide for attorneys fees for collection actions and a 35% collection expense fee for unpaid freight charges. (Page 7-8). Tropical, however, asserts that the collection expense fee provision is specifically limited to situations in which Sea Star/ Carrier failed to receive payment of *"freight charges."*

The tariff that Carrier sues upon contains a provision which expressly states that "the shipper, consignee, obligor, holder of the bill of lading and owner of the cargo are jointly and severally liable for all freight, demurrage, general average and all other applicable charges, including, but not limited to, court costs, expenses and reasonable attorney's fees incurred in collecting sums due..." (See Plaintiff's Exhibit 43, Tariff Number 500, Rule Number 007, Paragraph A(g)). However, paragraph A(h) states that "failure to receive payment of *freight charges* within the confines of this rule which

requires contracting the services of a collection agency and/or attorney will be subject to a 'Collection Expense Fee' of 35% of the total amount due." (emphasis added). The provision does not mention demurrage charges. As noted by Tropical, if Sea Star intended to include unpaid demurrage charges in the above penalty provision, it could have done so as it did in paragraph A(g) of the same document.

Tropical notes that any ambiguity in the bill of lading must be construed in favor of it and against Sea Star because Sea Star drafted the document. This Court agrees; Sea Star chose the language at issue.[4] The Court finds that Plaintiff did not use the word freight to denote demurrage; the Collection Expense Fee cannot be applied in this demurrage action.[5]

**Defendant's Counterclaim for Diminution of its Business**

As noted, Tropical contends that Sea Star wrongfully terminated the shipping agreement which forced it to incur increased costs for shipping its goods. Carrier argues that the settlement reached in the case of *Tropical v. Sea Star Line*, Case No. 03-21080-CIV-Ungaro-Benages, in the

---

[4] As Tropical notes, demurrage and freight denote different concepts. Demurrage in maritime law means "a liquidated penalty owed by a charterer to a shipowner for the charterer's failure to load or unload cargo by a certain time." See *Black's Law Dictionary*, 444 (7th ed. 1999). Freight is defined as "the compensation paid to a Carrier for transporting goods." See *Black's Law Dictionary*, supra, at 677; *Continental Ore Corp. v. United States*, 423 F. 2d 1248, 1250 (1970).

[5] This Court also agrees that the 35% Collection Expense Fee in the present case is unreasonably disproportionate to the damages actually incurred by Sea Star/ Carrier in attempting to collect demurrage and thus serves as an impermissible penalty. *In re Apex Exp. Corp.*, 190 F. 3d 624, 638 (4th Cir. 1999)(discussing the I.C.C. and the principle that a late payment fee should be reasonably tied to the carrier's anticipated collection expenses); *Resnick v. Uccello Immobilien GMBH, Inc.*, 227 F. 3d 1347, 1351 (11th Cir. 2000) (refusing to reward the collection fee sought when actual damages were minimal in breach of contract action). Plaintiff has offered no proof regarding the actual expenses incurred in collection of Tropical's demurrage. Thus, it is not possible for this Court to ascertain the reasonableness of the fee.

8

Southern District Court of Florida, was a settlement with prejudice of all of Tropical's claims against Sea Star including the counterclaim that Tropical brought in the present case.

Regardless of whether the settlement reached in the case of *Tropical v. Sea Star Line*, Case No. 03-21080-CIV-Ungaro-Benages was a settlement with prejudice of all of Tropical's claims against Sea Star including the counterclaim that Tropical brought in the present case, Tropical has failed to prove its case.

Tropical submitted "evidence" that its shipments went from an average of twenty-two containers a month to an average of eleven containers a month for a nine month period at a price of $3,000 to $3,300 a container; Tropical contends it lost approximately $312,000 dollars during the nine month period between October of 2002 to May of 2003. The evidence is summarized on Tropical's graph. Defendant's Exhibit 3(e).

Even if the Court decided that Tropical's graph demonstrates a loss of business during the relevant time period, Tropical has offered *no* evidence that Sea Star caused the loss of business. The Counterclaim is dismissed.

In conclusion, the Court finds that Carrier is entitled to a damage award of $55,448 ($97,790.00 in invoices minus $42,342 for the invoices lacking complete pick up and drop off information = $55,448 ).

Accordingly, it is **ORDERED and ADJUDGED:**

1. The Clerk is **DIRECTED** to enter judgment in favor of Plaintiff and against Defendant Tropical Distributors Center, Inc., in the amount of $55,448.00 plus prejudgment interest at the statutory rate from October 21, 2003 plus post judgment interest at the legal rate.

2. Defendant's counterclaim is **DISMISSED**.

3. The Clerk is directed to close the file.

**DONE AND ORDERED** at Jacksonville, Florida, this 21ST day of ~~November~~ December, 2005.

HENRY LEE ADAMS, JR.
UNITED STATES DISTRICT JUDGE

Copies to: Counsel of Record